Take a moment if you need to get settled and whenever you're ready, you may begin Mr. Poon, I believe, for appellants. Thank you, Your Honor. Michael Poon for the appellants. I'd like to reserve four minutes for rebuttal. Granted. May it please the Court. Even a short perusal of the Magnuson-Stevens action may clear that the Mid-Atlantic Council has significant authority. So the next question is about whether they're principal or inferior officers. And there, the powers of the Mid-Atlantic Council outside of the two-step rulemaking process, where there is no supervision at all from any Senate-confirmed officer, means that the Mid-Atlantic Council members must be themselves Senate-confirmed as principal officers. So the real question is what to do in remedy, with severance, and there the Court should look first to the text of the statute, which says that... ...these councils have significant authority, correct? Yes, Your Honor. And you cite in your reply brief several instances where they can act to force the Secretary to adopt emergency regulations, etc., etc. But you note that these powers are exercised infrequently. Do you not? You make a statement of powers, although infrequently exercised. Yes, Your Honor. I think that refers to one specific power regarding the power to force the Secretary to issue regulations by denying consultation under 1854b3. But would you not agree that the major function of these councils is not to exert power or authority under those specific unique situations? But the functions are set forth in the statute as preparing and submitting reports, conducting a hearing, submitting reports, reviewing, developing. They have a responsibility for sure, but they don't really have significant power, do they? The Secretary is the one who enacts regulations, and without regulations, the plans are toothless. I do not agree, Your Honor. The Congress was clear in establishing the councils, I think it's in 1851, where it says it's creating the councils to steward the federal fisheries with sound judgment. And so even from that, it should be clear that the Mid-Atlantic Council members are not there to simply advise. And even if some of the powers were infrequently used, which I don't think we know that, there's nothing in the record suggesting they're infrequently used, that is not part of the test for significant authority. And infrequently used power could... What is the test for significant authority? First of all, there has to be authority, which is power, correct? Yes, Your Honor. Okay. And then it has to be significant. Yes. How are the powers here significant if the major function of the council is to prepare plans, which nothing happens with those plans, they're not powerful, until the Secretary enacts regulations? So how is what they do significant power? So several points, Your Honor. First, the test for significant authority is whether the official has or is vested with an important function with significant discretion. This Court already accepted that test in CERCO. It's the test that's been accepted by circuits across the country. And I don't think that we can look at any of these powers that we've identified and say, well, they're not important functions or there's no significant discretion here. Can I ask you, so where do we draw the line? Everyone seems to agree that a purely advisory body would not be exercising significant authority. Is that right? If it just offered its views and then the Secretary could do whatever the Secretary wanted, that would not be significant authority, right? Yes, Your Honor. Now, I think one of the points of disagreement between you and your friends on the other side is whether a veto or blocking power counts as significant authority. That's the gist of the fight over page 56, note 12 in their brief. And you find three different places where they can block delegation to states, they can block some management plans, they can block rescinding an existing plan. And your friends on the other side seem to say, you know, blocking repeal of a plan under 1854, that's not affirmative power. Or blocking the delegation to a state under 1856, that's not. Why should we understand a blocking or veto power to be significant authority? Because you've come up with several examples of it, and this is a legal question about whether that counts. Yes, Your Honor. So one, we can refer to the test, which is important function with significant discretion. I think it's clear that blocking the Secretary of Commerce from regulating fisheries, federal fisheries, as she sees fit, is an important function with significant discretion. Where the government's reasoning leads is if you have a super vetoer who can block any action in the executive branch, that wouldn't count as significant authority because all they're doing is blocking. They're not actually binding anyone. But the council does bind the public, not only through the two-step rulemaking process, but also in deciding whether or not to allow delegation to states under Section 1856. In that, the blocking decision itself determines whether there will be regulation by federal bodies or regulation by state bodies. So that's not an action versus absence of action sort of situation, like blocking the repeal of 1856. It's choosing which regime will be regulating the fishermen. If you're right on that, but some of your arguments don't really meet that standard. Like the argument about 1854b3, the Secretary shall consult. Now, you say, well, we're able to find this Oceana case. The reg in Oceana ultimately went away on other grounds. No one seems to cite any other example. But the government suggests we should just read this as that's a, you know, it's a scarecrow. It doesn't really happen. We could just construe this as not a power the government has, in which case, as long as, you know, the council can't block the secretary by refusing consult, then the problem would be three goes away. Right. If you were to construe that provision such that the council can't do that, then yes, that problem would go away. And how about the requirement of emergency regs? The council cannot tell the secretary what at all needs to be contained within emergency regs. If they say go adopt some emergency regs, there's nothing that makes the secretary adopt anything in particular. So how is that power? It doesn't lead to any particular thing being foisted upon the public. Your Honor, respectfully, I disagree. That provision says that the secretary shall promulgate emergency regulations to address the emergency or overfishing. But the content is not, they don't even, she doesn't even have to consult about the content. And those are only good for six months anyway. Then they have to go out for notice and comment. So it's, again, it's not all that powerful because she can decide what the emergency regulation should say. Well, we know that the emergency regulation has to address the overfishing or emergency that the council identifies. But it doesn't say how or what or what she has to say, just she has to address it. They may not agree, but it's actually her power, isn't it? It's, we don't agree. We think that is a shared power and that the council being able to force the secretary to do something when she may not want to is a significant authority. It's far greater, certainly, than the STJs, the special trial judges' significant authority in presiding over B-4 cases in discrete adjudications under the. In this specific situation, the plan came up with these percentages, which you obviously object to. Then it went out for public comment, did it not? Yes, Your Honor. Did your clients offer comment with respect to these percentages and the fact that they shouldn't be put into play? I'm not recalling at the moment, Your Honor. I believe they may have, but I can come back to you. Let's say that they did and they brought to the attention of the secretary how this is really economically disadvantageous for them, which falls under one of the standards, sub-8 of the standards, saying if there's an economic impact. So the secretary could then consult with the council, but the secretary could change those percentages if she wanted. Could she not in response to the public comment? And other than consulting with the council, the council could have no say in that. Isn't that correct? That is not correct, Your Honor, because any implementing regulation under 1854B has to implement a fishery management plan or amendment. There is no possibility of deviating from the fishery plan or amendment. Well, then what's the purpose of public comment? Isn't that what happens in public comment? She's decided and she has to publish in the Federal Register why she diverts from the plan. That's pretty specific. Your Honor, I believe that's the purpose of having, I think that question goes to why do we even have a two-step procedure, right? Why don't we just have a regulation proposed by the council and just do comment there and then it goes out the door? I believe that the two-step procedure is there because the fishery management plan is to set the general policy. So let's say we're going to pick these percentages. It's going to apply in this general area of the ocean. And you get to the regulation, and the regulation says it draws the actual longitude and latitudinal lines, and maybe there's some error there where a commenter will say, well, actually, this line should be over a little bit because there's an island there. I don't know. So it's at that point that you would have these technical corrections, but there's nothing in the statute that allows for a deviation from the fishery management plan or amendment for the regulations. I'm reading sub 3 of B, and this is after the notice and comment period. The secretary shall promulgate final regulations within 30 days after the end of the comment period. The secretary shall consult with the council before making any revisions to the proposed regulations and must publish in the Federal Register an explanation of any differences between the proposed and final regulations. But there's no limitation on what those differences could be. And she may consult with the council, and they may say, well, that's wrong, and she may totally disagree. Doesn't she have the ability to implement a regulation that does differ as long as she explains that? No, Your Honor, because that would contradict other parts of the statute that we cited in our reply brief specifying that implementing regulations have to implement a fishery management plan or amendment. A deviation would not be an implementation. Well, then why should she be allowed to make any revisions at all? Well, it doesn't say de minimis. It doesn't say de minimis, Your Honor, but you can implement a fishery management. I see I'm out of time. You can implement a fishery management plan or regulation with that while making small changes that adhere to that fishery management plan or amendment. And so that's what that allows. At this step of the process, the council has gone through years of analysis, of hearings. You've gone through notice and comment for the fishery management plan or amendment already. Congress would not have expected large changes at this very last step of the process, and if there were large changes. Is there a case that supports that proposition? Because certainly if that's the case, then I would think there has to be some case where she did deviate greatly, and someone wanted to bring a suit saying she didn't have the authority to do that. That's exactly Oceana, Your Honor. The secretary tried to withdraw the regulation there, which is a large deviation, and it wasn't permitted because she didn't consult with the council. Well, that case is sui generis, and it's also an unpublished opinion. The rule was overturned in Burke. So it seems I don't think your friends on the other side are disputing that that would be a problem, but they're just disputing that that's, in fact, how it works. Maybe the government wants to defend the way that Oceana went down in your telling, but that seems like the thing you're most concerned about. So if your friends on the other side were to give that up, it would not be a problem just to construe the statute to say you can't do that, you can't force it to become a reg, would it? Well, if the government were to concede the point, we would happily take that concession. Just so long as we're talking about the history of Burke and who knows what, we were the attorneys in Burke. So we have the background there. I'd like to ask, if we were determined that these are officers, and therefore there is a constitutional problem here, let's say they're inferior officers, and 11 were appointed by the secretary. So wouldn't that pass muster from a constitutional standpoint? No, Your Honor, because the scheme that's created by the Magnus Stevens Act is a gubernatorial nomination and secretary confirmation. Well, nomination is one thing, and it's passing these names along, but the appointing authority, the secretary does appoint, correct? She makes the final decision, yes. Is that all that the statute requires, that the Constitution requires, appointed by the secretary? No, Your Honor. When we ask what the appointment power under the Appointments Clause is, we know that the appointment power includes the nomination power, and we know that because the presidential nomination and confirmation process is a joint usage of the appointment power. So we know nomination is part of the appointment power. If that were the case, Your Honor, the Congress would be able to circumvent the Appointments Clause very easily by just saying, well, the secretary has to appoint someone nominated by some random person, and that person can nominate one person. We know from Myers v. United States that the problem with Appointments Clause violations in cases like this is when we trench upon executive choice. When the governors narrow the choice available to three or 15 people, that is so far narrowing what is available to the secretary. It's certainly trenching upon executive choice. Seven of these people were picked directly by governors, right? Correct, Your Honor. Well, two of them were picked directly by governors. Five of them were picked by the designees of the governors. So an even farther dissipation. Seven of them had no federal involvement in the selection. Correct, Your Honor. Correct, Your Honor. Can I still ask a question? Of course. Again, if we were to find a constitutional problem, could we do what the Supreme Court did in Buckley and give prior actions and determinations de facto validity, notwithstanding what we might find in this one case? Your Honor, the de facto officer doctrine is more abundant. The government doesn't even raise it here. So let's see. So I believe the Supreme Court said in Nguyen v. United States that the de facto officer doctrine can be used to validate the past actions of judicial officials in cases where their appointment had a technical defect. The defect here is not at all technical. And the Supreme Court went on in Ryder v. United States, which was an appointments clause case, to say that we're not going to apply the de facto officer doctrine to appointments clause situations, because the appointments clause is quite important. And then it cast doubt on whether de facto officer doctrine was really even still alive. It confined past uses of the de facto officer doctrine by the Supreme Court to their facts. And in other cases, I think like Buckley, the Supreme Court said, well, it's not clear that we actually even invoked the de facto officer doctrine there. We never really said it. So it should be clear from Nguyen and Ryder that the de facto officer doctrine doesn't apply here. Counsel, I have a question for you about 1854A3. This is the provision where if the secretary doesn't notify the counsel of her approval or disapproval within 30 days, the plan or amendment shall take effect as if approved. What does it mean for a plan or amendment to take effect? So for the plan or amendment to take effect, I understand it to mean it binds the future regulation that's coming down to implement the fishery management plan. It wouldn't really mean anything if it didn't do that, right, because we know that the fishery management plan doesn't itself directly regulate private parties. So for it to take effect, it would have to give effect to that phrase. The most sensible thing from the structure of this section is that it binds the promulgator of the implementation regulation. Do these plans typically say no more than this many scum from this sector of the ocean? Do they have numerical limits on the overall amount of catching in a sector of the ocean? Yes, Your Honor. That's what happened here. The specific allocations were specified in Amendment 22. In another case in which we're litigating with the circuit right now, the quota reduction there was specified in the amendment. So it's really fairly specific, Your Honor. All right, because I guess what we're having a hard time understanding is the disjunction between, in these multilevel environmental schemes, you have like an overall plan, and then you have regs that turn them into something on the ground. So if the overall plan cuts the number of scup to be caught by 20 percent, there's going to be another step that allocates how those cuts trickle down to each individual fisherman. But the cutting of a quota by 20 percent is going to wind up having consequences on the numbers of permits and the amounts of the permits that get issued. Is that how the two work together? So how this generally works outside of a situation where you have individual fishing quotas, which is a limited access system, how I understand this to work is that when you cut the quota, there aren't really further steps. What happens is, well, we know this is the quota, this is the season, and when you get close to the quota, the agency just issues a notice in the Federal Register and closes the fishery. Oh, sure. So what you're saying is there's limited fishing plans, in which case it's an individual number for each person. But the default is going to be when we hit number X, we close off fishing of this species for the season. Yes, yes. Which then means that if the number has been reduced in the plan, the secretary doesn't have to do anything further to translate it into the downstream, these fishing boats are going to stop fishing. The secretary's going to publish a stop, and then everyone's going to stop as soon as you get to that total number cut. Yes, well, there's the implementing regulation that has to come after the plan. But other than that, yes, it just reduces the quota, and then you go ahead and you close the fishery when you get close to the quota. Here, there is a little bit of a twist because the states themselves, they have a way of sort of dividing up quota amongst themselves. And so there's a further step that the states do, but in general, that is how it works. So your understanding is there's going to be a fairly predictable ripple effect. It might not be exactly one-to-one, but a substantial increase or decrease at the plan level is going to have ripple effects with some kind of proportionate increase or reduction, if it's these individual plans or states allocate. Otherwise, it's going to lead to either speeding up or delaying when the cutoff date winds up getting hit, if it's an overall number. Correct. I believe in either Black Sea Bass or Summer Flounder, one of them, I think it's Black Sea Bass, the division of the quota or the overall quota is set by regulation. The fishermen from this state get this percentage. The fishermen from this state get this percentage. And so when you reduce the quota, it automatically reduces the quota for fishermen from X state. Without any further implementing regs, because the regs on the books already have some percentages. Correct. I will welcome if you want to hear from the government, if it disagrees or understands it to work differently. But that is a helpful explanation that didn't come across in the briefs. Do you have standing vis-a-vis the allocation for SCUP? We're not disputing that we don't have standing, Your Honor. In your reply brief, you outlined four provisions of the statute, which, in your view, give the council's final powers. For instance, 1854C3 and limited access systems and so on and so forth. Did any of those provisions come into play with regard to Amendment 22? No, Your Honor. Just as the STJ's non-B4 powers did not come into play in FriTag, yet the court considered them. Because it doesn't make sense, as said later in Lucia and also in FriTag, it doesn't make sense to consider officials a certain kind of officer or non-officer in one case and another kind in another case. Okay. So if, you know, setting aside what you contend are council's significant authorities within the two-step rulemaking powers, if we were hypothetically to agree with you with regard to those four final powers of the council's, how and perhaps deem them unconstitutional, then how would that affect Amendment 22, if at all? Your Honor, are you suggesting if the panel were to sever those provisions? If those were the only significant authorities that the panel identified and it were to sever those provisions, in one sense that would solve the problem, but it wouldn't actually because there are many other powers that the council has outside of the Magnuson-Stevens Act. So what you might do, you might, the panel might say, okay, we're severing these significant authorities. We're going to go on our merry way. Everything's fine. We're not going to vacate the rule. But then there's going to be another case with another significant authority. For example, the council has powers in the Marine Mammal Protection Act in implementing statutes. Those are at issue in this case? No, those are not at issue in this case, just as the non-two-step rulemaking powers are not at issue in this case, and yet they're at issue insofar as it determines whether or not they're officers. So what the court would do if it severs, it takes the government's severance argument and chooses to sever the significant authorities that it finds is it will find itself playing whack-a-mole with every time another significant authority pops up in some other dispute, and it would have to sever that and create the disruption that comes with severance. Or even worse, maybe there's a power out there where the severance analysis comes out the other way. Are you suggesting that we're supposed to declare these folks officers based on hypothetical powers that haven't been presented to us in this case or to the court below? No, but it's a disruption that you should be considering. For example, there is a power in Public Law 104-403 from 1995, didn't even make it into the U.S. Code, under Title VIII, which is labeled miscellaneous, Section 802. It forbids the Secretary of Commerce from approving permits for foreign fishing of mackerel or herring in the Atlantic unless the relevant council approves those permits, and the Secretary of Commerce includes all of the permit conditions required by the council. So this is the sort of thing that you could expect to pop up if you take the government's severance argument. But then you are doing what Judge Freeman says. You're saying there should be no officer status based upon powers that exist in other laws. I mean, the council can't be constitutional for some purposes and unconstitutional for others. I mean, they can't be officers for one power and not officers for another, can they? Absolutely, Your Honor, and that's why you should take our severance argument if you were to sever, and you should sever the appointments provisions and allow the appointments clause to serve as the default provision requiring the council to be Senate-confirmed, and then you wouldn't have this whack-a-mole situation. You wouldn't have a flip-flop situation where, oh, maybe the severance argument goes the other way. You would have an enduring separation of powers decision, which the Supreme Court in Youngstown and recently again in Trump v. United States said separation of powers decisions need to be enduring. That's what you'll get if you take our severance argument. And that would keep the action here. Well, the action here wouldn't be affected. The action here would require to be vacated, Your Honor. Exactly. So that they'd be inferior officers but properly appointed. At that point, you actually wouldn't have to decide whether they're inferior or principal officers if you sever the appointments provisions because Senate confirmation is appropriate for both. If the Court has no more questions, I will reserve my time. Thank you, Your Honor. Good afternoon, Your Honor. May it please the Court. John Biese on behalf of the United States. I'd like to start with a quick overview of how we see the case. From our view, it's a straightforward answer to the plaintiff's complaint that the counsels are purely advisory and don't have power to execute or administer the law. Okay. Can we get a few preliminary things out of the way? Sure. Your Honor, you have not disputed that the members of the counsel have continuing positions, that there's an issue with, like, their term or duration in office that would otherwise disqualify them. We've assumed for the sake of argument that they have continuing positions. You're not disputing that? You have not raised a dispute? Our view is that they do not have continuing positions, but we recognize that's a difficult position in the face of the current case law. So you're not pressing that argument? Yes. All right. And you are not arguing that all the members of the counsel have been appointed in compliance with the appointments clause requirements?  We acknowledge that the regional administrator was not appointed by the secretary, and there's no other argument for that. And the gubernatorial, the five and the two, those are not appointed? On those, I think we're reserving our arguments because they could be, as state officers, entitled to do certain things with federal power, but I think it's beside the point here, because if you think everyone needs to be an officer, and we've already acknowledged that. And you're not disputing that everyone needs to be an officer, that you can't just say, okay, well, this particular vote was taken by people who were officers? I think, in our view, if, you know, if they are officers, they act by voting, and if their votes are invalidated, you would still have a vote by the duly appointed senatorial, secretarial appointees, and the majority of that group did vote for the provision. So we're saying that that form. Remedy might involve, when we get to remedy, it might depend on who was or wasn't, but there's no question that whoever wasn't appointed validly, like, if you don't have a majority, then that's going to be. Yes. Invalidate the action. Okay, great. So please, go on to the meat of the argument. So I guess we think there's a straightforward answer to the plaintiff's complaint, that the councils perform an advisory role only and don't have authority to execute or administer the law. And there's three steps. But, Mr. Kander, you don't really deal in your brief with the standard at all. You don't really talk about Lichia or FriTag. In those cases, they talk about those judges exerting broad discretion with a lot. Isn't that what happens here? The councils do a lot of the work that has to be done here. They have staff. They provide these regulations, proposals, and they do a lot of the work. Why is this not tantamount to what, in FriTag and Lichia, we said, this is pretty serious. This isn't just ministerial or functionaries. This is pretty serious stuff. So they might have significant practical influence, but what they don't have is legal power. And I think if you look at FriTag. Legal power. I think that's your argument about, well, compelling emergency regs. Right. Your answer would be, well, they don't ultimately do anything under 1855C2A, right? And also, I think there, the secretary has a representative on the council, so they can block a unanimous vote whenever the secretary wants. That's another way. But what I do want to know about is the multiple blocking powers that are in here, right? There are several that fall into that category. I mean, I think your position on consult is they can't just willfully refuse to consult as an OCEANA, and so, therefore, there's not this. This is a misunderstanding. You're not making any claim that the council can force something to become law by refusing to consult. Yeah, we think OCEANA is wrong. We think that consult just means ask. All right. So that's easy to write around. But what about the blocking powers? There's the power to block a limited access system under 1854C3, okay? There's 1854H. There's blocking repeal of a plan. And then there's 1856A3B, blocking delegation to a state. So let's group those together. Why should we understand that to be on the purely advisory body side of the line and not, you know, you've got this footnote on page 56, note 12, and you're basically saying, well, the secretary ultimately has to act. But blocking does not sound like an advisory body here. Sure. I guess from our perspective, those three limited concurrence provisions are, I guess, there's three reasons why we think they don't make the members of the councils here officers. First, limited concurrence provisions like that generally aren't viewed to be the kind of legal power necessary. Explain. Is there precedent that says that? There's two cases, a Ninth Circuit case and a Sixth Circuit case under the Indian Gaming Reform Act, which says a governor has to concur when the secretary of interior takes new land in the trust of Indians for gaming purposes. And that secretarial concurrence provision was evaluated by those circuits under the appointments clause after FriTag. And both included.  I didn't notice them in your brief. So I think one of them is cited in the footnote, and that's the court Oriel Band of Lake Superior Chippewa, which is at 367F3-650. Okay. And the discussion is at 660-62. That was a 2004 Sixth Circuit case. And then the other one is not cited in the brief, but it is Confederated Tribes of Siletz Indians. Can you speak up a little? Confederated Tribes of Siletz Indians, which is at 110F3-688. And then the discussion is at 696-98. That's a Ninth Circuit case from 1997. But then there are also a lot of other cases where courts, where Congress has asked conditioned action on state or local concurrence. And you have examples all the way back to Curran v. Wallace, which involved a case where the Secretary of Agriculture could inspect and grade tobacco in a market, but they could only designate a market for that activity if two-thirds of the growers in that market voted in favor of letting the Secretary of Agriculture do that. That was approved in 1939. There's a National Wildlife Refuge case in North Dakota v. U.S. I'm not sure if that's right, but I'm also not sure if that's analogous here. Your friend on the other side explained to us, okay, let's say you have a court of 100,000 scope, okay? And then you have regs that say, that turn that into different percentages, okay? Maybe the percentages are per state, maybe they're for individuals. But if the Secretary wants to, you know, if you get a new plan in place and it raises the amount or lowers the amount, that's going to be translated into effect. And conversely, if the council blocks these numbers, it's not like the state's saying, okay, you can take our land into trust. You're blocking something that's going to have effect on private parties' ability to fish in some mathematically predictable way. So I guess two things I'd like to say on that. First, in the context of the three provisions we're talking about, those are all in very narrow, limited circumstances. They're not ability to block just anything. And they are circumstances that happen very infrequently. For instance, agency council can recall only one instance in the past 50 years. They haven't been there all 50 years. It wouldn't be a big deal to the agency if we wound up either severing or invalidating those provisions. Right. I think each of those, which happens fairly infrequently, if you think they create constitutional problems, there is a simple solution of rendering them advisory or severing them. And on the A3 stuff about the concurrence, I think your position on A3A was we should not read it very narrowly to say only narrow legal grounds are a basis for the secretary to disapprove a proposed reg. Could we read it broadly enough to say that the secretary could have a disagreement based on policy, based on culture, based on aesthetics, based on respect for Native American fishing grounds and things like that that aren't expressly provided for? So I think A3 gives the secretary pretty broad authority on what basis she wants to approve, disapprove, or partially approve a plan. If we did not read A3A the way that appellants are concerned we read it, we could construe around that problem. Right. I think they're the ones that are making inference from the text. What they're saying is not in the text and where avoidance is an option, we think you shouldn't draw that kind of inference. What about the A3 hanging paragraph, silence winds up being approval, something takes effect? That's kind of like a CHATA legislative veto type situation, which again sounds more than advisory to me. Yeah. So I guess to address that I want to actually clarify something from the discussion earlier. The fishery management plan is just a management framework. It has no effect. The numbers in it don't affect how people fish. The only thing that affects that and might have trickle-down effects is the implementing regulations. But your friend on the other side said if regs are already in place and then a plan gets repealed or amended or something, the regs will then translate the revised numbers down. I think that's incorrect. For instance, the annual catch limits have to be put in the regulation, implementing regulation, before they have that effect to be allocated. They have to be in a regulation to have any binding effect. And, of course, if something gets – this only happened, I think, once again in people's recollection. But if something gets approved this way and the secretary has a problem with it, she doesn't have to issue implementing regulations until that problem is fixed. And it's the regulations that actually have bite. Even with the council saying, hey, you've got to issue some emergency regs. So in that context, again, she has plenary authority, what would be in those regs, and has someone on the council who can block it. Okay. When you read the provision saying what she has to use as the barometer for approval, consistent with national standards, other provisions of this chapter, and any other applicable law, are these things broad enough to include policy? I mean, there are policy statements in the law itself. So can she look at policy as part of her review? In our view, if you look at the national standards, for instance, those are very broad provisions that have a lot of discretion baked into them, and that the secretary is the one who is making those calls about what's consistent with the – you know, what is optimum yield from this fishery? What's the science support? Number eight seemed pretty broad to me.  One is very broad. I think a lot of them are very broad. And she exercises discretion there. And also the entire act includes, of course, the purposes and functions, sections of the act, which also have things that could trigger. How about when we get down to B sub 3? We've had the notice and comment period. She's to promulgate final regulations, consult with the council, and then she can make revisions, and she has to explain them. Is there a limit on those revisions? Your friend seemed to say that they have to be kind of de minimis because they have to be in accordance with the plan. But is there a limitation on those revisions? In our view, there is not a clear statutory limit on her discretion to make revisions there based on the comments she's received. I think as a matter of prudence, the agency would normally want to amend – also try to amend the plan if they thought there needed to be a different thing in the regulations. But I don't think there's an express legal requirement on that. I think Judge Freeman wanted to ask a question.  No, while we're getting at it, the plan is in fact never published. In this case, the plan itself wasn't published in the federal register. The plan itself, there's a link to it. You can write to somebody and get a copy of it. But ultimately, it's the regulations that have the effect of law. Only the regulations can bind participants in the fisheries, and only the secretary can promulgate them. The plan – there's a notice of availability for the plan, so everyone is aware of it and can comment. But that's a separate process. Now, under the APA, agencies can be sued for inaction. Can the agency be sued based on the plan, based on failing to put the plan into effect, deviating from the plan? In our view, they would not be able to. And if you look at the judicial review provision in 1855F, and the statute is limited to suits about regulations promulgated by the secretary and suits about actions taken by the secretary under those regulations, those are the only suits under the Magnuson-Stevens Act where the United States' sovereign immunity has been waived. And so you couldn't bring a suit based on other grounds that aren't either the regulation or inaction taken under it. Are there other analogous entities such as this where you'd look at them and say, gee, they're not just ministerial or just pure functionaries. They're very busy. They have a big role to play here. You know, shouldn't they be appointed by the president? Are there other councils that enable the secretary? I mean, the Secretary of Commerce, the duties are so wide. I can understand why we have these councils because how is the Secretary of Commerce to know? We need the scientific information, et cetera, et cetera, all these reports. Are there other analogous entities that do this for different executive branches? There aren't any that are exactly like this, but there are a lot of places where Congress has asked for advisory bodies to play an important procedural role, and you can look at things like the advisory committees for FDA drug approval or the advisory committees for a lot of EPA actions or the National Petroleum Advisory Council. Those are all places where there are kind of outside people who have an important procedural role but don't have legal say. There are actual plans, the way this council comes up with an actual plan, that probably 90 percent of the time becomes the regulation. I mean, I don't know, but as a matter of practice, it's not a matter of record, but it looks like, especially at the speed with which the secretary is supposed to act on some of these things, it's like a revolving door. You better wake up Monday and look at this or else it's going to take effect and they're going to propose regulations that are consistent and you're not going to have a lot of wiggle room. So in non-emergency actions, we actually think there is a fair amount of time. There have been cases where it's been seven years between the plan and the final regulations, but at the end of the day, it is just advisory. Federal advisory committees do the same thing. They propose regulations. They propose federal actions, but they're not the deciding official. They're not the one that can take legal action. So we're in the natural resources context here, but let me ask you, I presume you also do some litigation of Clean Air Act, Clean Water Act. You know, there are these state implementation plans, et cetera, and yet isn't there generally judicial review at the stage when, you know, there's a Clean Air Act plan or Clean Water Act, but before you get down to the permitting level? So I'll confess I'm not familiar with Clean Air Act on those issues. Okay. All right. Let's talk about remedies a little bit. Sure. What are the right remedies? One possibility is to just sever the appointment mechanism, right? And then we have this question about what to do about past actions. Another possibility is either to construe the apparent powers, vetoes, et cetera, as not in fact that or in fact not limiting the Secretary's power or severing them. Do you agree that we have to view these people as a package? It's not like you're an officer of the U.S. for some purposes or not, that if in some cases they have officer powers, then we need a remedy that addresses all of those cases. I guess I think we'd agree that that is the current law. I think whether you have to reach the question on, say, provisions that are an issue here and whether they need to be severed on the remedy side, I don't know. But I guess I hope to persuade you that you don't need to reach the remedy issue, but it turns some on the basis of the court's conclusion that the portions of the act are unconstitutional. The plaintiffs have two kind of theories all grouped together on why it's unconstitutional. One is in the structured process for regs and plans, which they call the two-step process. And the other is on these kind of three or four ancillary provisions that are these limited concurrence provisions. On the first one, I think if you think there's a problem in that structured review process, the solution would be to sever whatever constraints you think it imposes on the Secretary's discretion in that review, and then it would render the counsel advisory, and that would be fine under the Appointments Clause. And likewise, the ability for the regs to become law without the Secretary's doing anything. So the plan – the regs never – regulations never take effect without the Secretary doing anything. The plans can take effect, but they have no legal impact until the Secretary acts. So there I don't think you need to do anything to fix that because the Secretary is the one who takes that legal step. I do want to hear from your friend on rebuttal whether he agrees or disagrees with the relationship between the plan and the regs and the effect of amending or revoking the plan on regs. And then I guess the other – if you think those kind of what I think of as limited concurrence provisions, if you think they're a problem, there again I think if you just view them as severed or view them – construe them to be an advisory role, that would cure any constitutional problems on those. I mean, again, we think you don't need to do that because we think those are limited concurrence provisions or if concurrence provisions are okay and they're in a limited area that's not like an important governmental function. And I think in our view plaintiffs kind of misread Fritag some because they focus on the special tax judge's ability to make B-4 recommendations and they view that as power, but that's not what the Supreme Court says. If we had discretion, should – how are we to figure out whether the better remedy is to just make the appointments process work the way that the officer stuff is supposed to work or to read those others differently or separately? I guess you'd have to think about whether – I mean, there's direction to make the most limited correction of the statute. You can't, in our view, this is the most limited because Congress's clear purpose here was to ensure the conservation and maintenance of the nation's fisheries and the best way to do that is this. And I guess the second part is if the effect of the remedy plaintiffs propose is pretty breathtaking, if it means effectively every secretarial action that was based on a council recommendation in the last 50 years is potentially invalid, it could have huge consequences for the fisheries, and I don't think Congress would want that result. If all of the provisions that involve what you call limited concurrence, what I'd call vetoes, were invalidated and the ability of plans to take effect without secretarial concurrence was invalidated and the – and then we read the secretary as having the ability to disagree on any ground, how many things or actions would that ultimately affect existing actions? Assume de facto officer doesn't apply, assume the worst for your side. It sounds like you guys have had a hard time coming up with situations in which, you know, Oceana sounds like a one-off, and then you said you knew maybe of one or two actions that had been blocked by limited concurrence provisions. There's not a huge universe of things that affect – There's been none that have been blocked. There's only been one time when there was even a revocation that people could recall. Okay. So this is not practically that big a deal then. Yeah, no. I think if you conclude that those limited concurrence provisions should be severed, I don't think it would be a big impact from our perspective. It would, I think, limit the voice that Congress wanted some people to have in that decision, but it wouldn't – Could you direct our attention to the one instance in which these have blocked something or required revision? So taking them in turn, I think there are a fair number of limited access provisions, but I don't think we're aware of it. I mean, it's been 50 years, so I don't know that people know every time, but the agency counsel wasn't aware of any time when the secretary wanted to do a limited access provision and it was blocked. Right. The revocation, I think people recall one revocation that was – I'm blanking on what the fish was. I can get that to you supplementarily. Yeah, a supplemental letter would help. Yeah, where something was revoked. There have been no votes in anyone's recollection where something was blocked from being revoked. And then – How about emergency? Emergency provision, there's never been a unanimous vote for emergency provision because this department has a standing policy that the regional administrator appears at every meeting and votes against any emergency measure, so it's never happened. And what was the – the third one is – and then, yeah, the delegation to the state is also not something that's happened. And I guess our concern is that plaintiff's remedy is very breathtaking and their solution is statute of limitations, which is – Limited management plans that require the three-quarter vote, that's not been an issue either. Sorry, which ones? I'm trying to remember which ones it is. The ones with the limited access system? Limited access, yes. So that's a quota, essentially a quota system, and there Congress thought it was important that the people in the market supported a quota system before it was implemented, and that's why this provision is in there. It's not something where there's ever been a vote, that I'm aware of at least, to reject the limited access system. And that is something that happens a little more frequently than some of the other things raised in these, but there hasn't been a vote against it. These aren't matters of record, obviously, what you're telling us, but I guess it's your way to argue against the significant nature. Right. We both think because it's purely concurrence of state and local voices and then because it's limited. But again, if you think the best solution is to sever those, we would not be opposed to that. Okay. Very good. If I could just say one, the arguments about provisions that haven't been cited in the briefing we think have been waived. If you have no further questions, we respectfully request you to affirm the district court's decision here. Thank you. Very good. One more question. We've got a couple minutes. Take your time. We won't start the clock yet. I have a quick question. Sure. Counsel, as a point of information, the amicus here is taking a position that would seem to be contrary to the interests of the commercial fishermen. I mean, they're supposed to represent the commercial fishermen. You're a commercial fisherman taking the opposite tack. Do you know anything about what their position is based on? Your Honor, I would just say generally that I believe some of the counsels have been captured by certain interests. I'm sorry, what did you say? I believe some of the counsels have been captured by large commercial fishing interests and left the small commercial fishing interests out of the process. But I wouldn't necessarily say that's what's happening here. Mr. B's saying that changes to the plan, amendments, revocations, et cetera, don't affect anything at all until you get new regs in place. Is that correct or not? That is not correct, Your Honor. We said in our analysis regarding Section 1856 that the state regulations have to be consistent with the fishery management plans, although the fishery management plans do not themselves directly bind the private fishermen. 1856A3 says the state may regulate a fishing vessel, blah, blah, blah, blah. If there is no fishery management plan or other applicable federal fishing regulations or if there is a fishery management plan, it has to be consistent with the fishery management plan and applicable federal fishing regulations. So the change in the federal plan is going to lead to changes in state plans and regs without any further federal action? Correct, Your Honor. Okay. Second, I'd like to address the sort of sky is falling argument from the government. The sky is not falling. There is a very short 30-day statute of limitations that's protecting all of the existing regulations. The Secretary can promulgate emergency regulations under 1855C1. She can continue regulations under 1854C. So the sky is not falling. This is not going to upend 50 years of regulations. On the point about these non-two-step rulemaking powers being rarely used, that's not in the test. There's nowhere in the Supreme Court's precedent that says, well, significant powers aren't significant if we're not going to use them that much. The presidential veto over congressional legislation is not used that much, and we know why. It's because if Congress knows there's a veto coming, they don't do it unless they are making some sort of statement.  Don't we have to look at that as determining that it's significant? If you are arguing to us that the powers that the council has, they show significant authority, and you point to these powers that are not used that often, doesn't that detract from the significance of the authority? I'm back where I was at the very first question. No, Your Honor. Whether a power is significant is whether it's an important function with significant discretion. Discretion includes the discretion not to use the power. So that can be happening in any of these cases. Maybe if we have the Lucia and the Freitag, they're talking about ALJs and tax judges that are doing this stuff day in and day out. They're enforcing things. They're having discovery. I mean, it's they're constantly exercising these powers, whereas this seems to be different from that. Oh, I don't think we know from Freitag, for example, how often STJs are using non-B3 powers, which the court relied on. But even if it wasn't happening very much, here, maybe these blocking powers would be used more often if they were Senate-confirmed and accountable to the president. Right? So we just don't know. There's nothing in the record that tells us this. Maybe these council members are shirking their duty by not blocking more often. We don't know. What we know is that these are important functions with significant discretion. That's the test. Let's see. The secretary can avoid issuing regulations if she disagrees with them? Not so. There is a strict timeline. We presume that federal officials follow the law. So if she ignores the law and doesn't comply with that timeline, that's a violation of the law. We don't assume that that's going to happen. I have further points, but I see my time is up. I'd like to thank both sides for excellent and helpful briefing and argument.